**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-214 (JDB)** |
| **JOSEPH LINO PADILLA**<br>**also known as "Jose Padilla"** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Lino Padilla to 171 months of incarceration followed by three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $820. This recommendation is in the middle of Padilla's Sentencing Guideline range after a one-level upward departure for terrorism pursuant to USSG §3A1.4 n.4.

**I.     INTRODUCTION**

The defendant, Joseph "Jose" Lino Padilla, a 43-year-old unemployed disabled army veteran from Cleveland, Tennessee, was an active participant in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

After a three-day bench trial, the Court convicted Padilla of ten crimes, including eight felonies. Those eight included two assaults on police officers, including one with a deadly or dangerous weapon, and obstruction of an official proceeding. As explained herein, a sentence of 171 months incarceration, three years supervised release, and $2,000 in restitution is appropriate in this case because Padilla (1) assaulted two police officers defending the U.S. Capitol, including one with a dangerous weapon, (2) stated multiple times before, during, and after the riot that he wanted to overthrow American democracy, in violation of his oath to defend the Constitution, (3) spent three hours on the West Front breaking through police lines, rallying other rioters to join him, and relentlessly berating police, (4) lied under oath about his motive for throwing a flagpole at the head of an officer, (5) lied under oath about his desire to violently overthrow Congress, claiming he only wanted to use lawful processes to challenge the 2020 presidential election, (6) weakened the police line by joining with other rioters in bringing a large metal banner to the police line, and, (7) brought a pair of goggles and a mask to protect himself against riot control measures.

The government's recommended sentence—which is in the middle of the advisory Sentencing Guidelines' range after incorporating a one-level upward departure pursuant to USSG

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

§3A1.4 n.4—takes into account Padilla's violence against police officers on January 6th, his inflammatory rhetoric before, during, and after January 6th, his untruthful trial testimony, his utter lack of remorse, and the urgent need to deter Padilla and others from engaging in political violence in the future.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

Having presided over the trials in this case and other January 6-related cases, the Court is well-aware of the details of the attack on the United States Capitol building and grounds by a mob of thousands of rioters on January 6, 2021, including specifically the violent events on the West Plaza and the Lower West Terrace "tunnel," in which Padilla participated.

### B.    Padilla's Role in the January 6, 2021, Attack on the Capitol

#### *Padilla's Social Media Statements Before January 6, 2021*

Before the riot, Padilla was a prolific user on several social media platforms including Reddit and thedonald.win.[2] Prior to January 6, 2021, Padilla posted several comments about his desire to participate in a violent revolution that included occupying the Capitol building to prevent Joe Biden from becoming President of the United States. For example:

- On or about November 14, 2020,[3] in response to a question asking, "What's your final fuck it, save the country moment," Padilla posted, "My final line is Biden

---

[2]  Sometime after January 6, 2021, thedonald.win forum changed its domain name and URL to patriots.win. Padilla posted on both forums under the username Ghost_Soul167.

[3]  Posting dates referenced in this section were determined using www.archive.org. For example, Padilla's post about resorting to the "cartridge box" was 154 days old when it was captured by archive.org on April 17, 2021, indicating it was posted on or about November 14, 2021. *See* https://web.archive.org/web/20210417202825/https://patriots.win/p/11Q8cCdTKT/serious-wheres-your-line-when-we/c/.

holding his hand up at his innauguration (sic). After that it's the cartridge box for me."[4]

- On or about November 15, 2020, Padilla posted, "Fuck it. I've said it before and I'll say it again. Biden raising his hand at his Inauguration is my breaking point. The Speakers box is burned down, the ballot box is full of stuffed ballots and the Jury box is filled with brain washed idiots. After that the Democratic Social States of Sino-America can consider me an Enemy of the State because I'll have to resort to the Cartridge box. I'm not Glowy, but I've had enough and feel there's no other way."[5]

- On or about November 16, 2020, in response to a post claiming that "Soon, Trump will give the order to shoot our way out [of communism]," Padilla responded that "Trump shouldn't be the person to give the order. It has to be organic from us." Padilla then posted a detailed plan about abducting Joe Biden and Kamala Harris on Inauguration Day, taking them to the Capitol building for an emergency joint session of Congress, implementing new laws regarding elections and U.S. citizenship, and convening a Constitutional Convention.[6]

- On or about December 8, 2020, in response to a post captioned, "If the SCOTUS fails us, 1776 it is then. I'm ready." Padilla responded, "War isn't glorious. It's human beings doing horrible things to each other. I've been to war, and I never want to have to kill another person again in my life. That being said, I think it is very close to the time to raise the Liberty Poles, call out the Militia, and prepare to water the Tree of Liberty again. It's not going to be easy or glorious. It'll be terrible. It will most likely have to be done."[7]

- On December 19, 2020, Padilla posted on Facebook, "Yeah, make sure you have a decent respirator. I full expect if it goes the way I think it will go, there will be pepper spray deployed en masse." (Gov't Ex. 300 at page 35).

- On or about December 20, 2020, in response to a post hoping for air strikes being called in against Antifa at the Capitol on January 6, Padilla posted, "We're not going there to fight Antifa, though some may show up. We're going there to

---

[4] https://patriots.win/p/11Q8cCdTKT/serious-wheres-your-line-when-we/c/

[5] https://patriots.win/p/11Q8gtHLY0/x/c/1BjsAem5I6

[6] https://patriots.win/p/11Q8lXgttd/you-can-vote-yourself-into-commu/c/

[7] https://patriots.win/p/11QlPBcImj/x/c/4DqcOKsgIgp

surround the capitol and let the politicians there know what exactly will happen to them if they vote to allow fraudulently assigned electors to vote. Make sure you bring rope."[8]

- On or about December 26, 2020, Padilla posted plans to "take over the Capitol Building" on January 6th: "We've gotta do it on the 6th or never at all. We have to take over the Capitol Building, immediately pass acts dissolving the current Legislative body, and fill the places with uncompromising Patriots from among those of us there. Send that to Trump to sign, then jump straight into passing laws to secure the Federal Elections and remove the monetary + power dynamic that has corrupted our political system, as well as convene a constitutional convention and add term limits to Senators and Representatives."[9]

- On or about December 29, 2020, referring to the slate of speakers scheduled to speak at the former President's rally on January 6th, Padilla posted, "They're gonna be there, trying to control us. We just have to ignore them, declare our grievances with the government as specified in the Declaration of Independence. Take the seat of power (the capitol building) and dissolve the currently seated legislative body. Anything less than this, even if Trump is voted the winner of the election, is going to be wasted effort since the corruption that inundates our political class will still be present."[10]

- On or about December 30, 2020, Padilla posted, "All that can be done is for us to assert the right delineated in the Declaration of Independence to dissolve our government and appoint new members to the legislature made up of patriots present on the 6th."[11]

- On or about January 2, 2021, Padilla posted, "We have to take over the Seat of Power, the Capitol Building. We have to declare our dissolution of the Government, listing our reasons why as directed by Thomas Jefferson in the 2nd paragraph of the Declaration of Independence."[12]

---

[8] https://patriots.win/p/11R4ujGuhT/january-6th-at-the-steps-of-cong/c/

[9] https://patriots.win/p/11RNolaBHQ/x/c/

[10] https://patriots.win/p/11RNyA1PMd/x/c/4DrwCJ2awmA

[11] https://patriots.win/p/11RO2rq9sF/x/c/4DrwVjwwBbX

[12] https://patriots.win/p/11ROC8N5xH/x/c/

- On or about January 3, 2021, in response to post advocating killing congressional leaders "THEN AND THERE" who refuse to apologize to the American people, Padilla posted, "Thank you sir. I've been screaming from the rafters that we don't need to go to DC in support of Trump's reelection, we have to go in defense of our Republic. Defend it by taking their chambers by force. Dissolving the government and replacing all sitting Legislators with patriots who gathered in DC."[13]

- On or about January 4, 2021, Padilla posted, "I fully plan to incite people to storm the Capitol Building and run ALL the politicians out of it. Belts and Whips strongly recommended."[14]

- On or about January 5, 2021, Padilla posted, "We need to take and occupy the Capitol Building."[15]

### *Padilla's Conduct on the West Plaza*

Padilla traveled to Washington, DC to attend the Stop the Steal rally hosted by former President Trump at the Ellipse. However, Padilla decided to leave the rally before the speech finished. Trial Tr. May 2, 2023, 389:18-24. Padilla then traveled to the U.S. Capitol and arrived at the West Plaza at approximately 1:20 p.m. He approached a line of MPD officers who stood behind a bicycle rack barricade that lined the length of the plaza. As Padilla got closer to the barricade, he called the officers "traitors" and "oath breakers." Officers then pushed Padilla backwards to stop him from potentially grabbing onto a bicycle rack and trying to breach their lines. Gov't Ex. 800 at 0:04-0:30. Shortly thereafter, Padilla threatened other officers, telling them that the rioters were going to trample them. Gov't Ex. 800 at 1:35-1:43. At 1:22 p.m., officers tried to move a different section of the barricade forward. As they did so, Padilla stood in their way, grabbed the barricade, and violently pushed it against the officers. In order to remove him from their line, the officers

---

[13] https://patriots.win/p/11ROGlbVMQ/we-have-no-obligation-to-stand-p/c/

[14] https://patriots.win/p/11ROGtZ69M/x/c/

[15] https://patriots.win/p/11ROLZ57Pb/x/c/

struck Padilla several times with batons. Despite these strikes, Padilla continued to grasp the barricade for several seconds until officers were able to stun him and push Padilla away into the crowd. Gov't Ex. 800 at 2:00-2:45.

At 1:32 p.m., Padilla moved to yet another portion of the barricade, adjacent to the media tower located in the middle of the plaza. Padilla wore a N95-style mask and a set of scuba goggles on his face. Gov't Ex. 209A. These goggles protected Padilla "against any chemical irritants that [officers] might deploy." Trial Tr. May 1, 2023, 24:13-14.[16] Padilla continued to berate the officers and accused them of failing to follow their oaths. Gov't Ex. 800 at 3:15-3:45. Padilla's intent behind this verbal assault was clear: he wanted Sergeant Cropper to stand down and let the rioters take over the Capitol. Padilla told Sergeant Cropper that he was "defending a machine that doesn't even fucking care about" him and that if the sergeant "let us in there" (*i.e.*, into the Capitol), "that machine will be gone." Gov't Ex. 800 at 4:27-4:39. Padilla questioned the sergeant's morality for letting "this government . . . stand." Gov't Ex. 800 at 4:52-5:07.

---

[16] On or about December 24, 2021, Padilla posted on social media that, although he coughs into his elbow, he does not wear masks in public. https://patriots.win/p/11RNk0LyQZ/x/c/4DrvFvpGbv7



Gov't Ex. 209A

Padilla then turned to another MPD officer and told her that the recent presidential election was fraudulent. Gov't Ex. 800 at 6:08-6:16. Padilla justified his participation in the riot, stating that the "second paragraph of the Declaration of Independence gives us this right that we're exercising." Gov't Ex. 800 at 6:16-6:23. [17] Padilla threatened continued forceful resistance, promising that if the officer pushed the barricade into him and the other rioters, Padilla would "keeping pushing, like [he had] done every time." Gov't Ex. 800 at 6:37-6:42.

At 1:35 p.m., Padilla began to push the barricade against the officers. The officers rebuffed Padilla with their batons and pushed him to the ground. When he stood back up, they deployed chemical spray against him. Gov't Ex. 800 at 7:00-7:15. Up until this point, Padilla's mask was down across his chin as he stood less than a foot away from Sergeant Cropper. Only after officers

---

[17] Contrary to Padilla's trial testimony that his online revolutionary rhetoric is "not what I'm like in real life was not real life," Padilla cited the Declaration of Independence in an angry tirade on the West Plaza just has he had done online moths prior, and just as he would do online in the days after January 6.

used the chemical spray against him did he attempt to cover his mouth with the mask. *Id.* at 7:16. Padilla then returned to the barricade and put his hands back on the section in front of Sergeant Cropper. Gov't Ex. 800 at 7:51. Padilla told officers again that he wasn't going to stop. Gov't Ex. 800 at 7:51-7:58. At 1:38 p.m., while screaming for his fellow rioters to "push, push, fucking push!" Padilla pushed the barricade into Sergeant Cropper and other officers. Gov't Ex. 800 at 8:11-8:41. Despite constantly pushing and hitting Padilla's hands, it took the officers half a minute to dislodge Padilla's grip from the barricade and push him back into the crowd. Gov't Ex. 800 at 8:51-9:16. Afterwards, upset that the other rioters had not helped him more, Padilla turned towards the crowd and told them, "you're all fucking cowards." Gov't Ex. 800 at 9:27-9:30.

In a social media post, Padilla later described the people in the crowd as "pathetic little LARPers who only pretend to be patriots." Gov't Ex. 301 at p. 10.[18] Padilla believes that true patriots, like himself, were those who "pushed through rails, stairs, and into the doors of the Capitol Building . . . without any [personal protective equipment] at all." Gov't Ex. 301 at p. 10.

---

[18] At trial, Special Agent Mac Montana testified that LARPers are live-action roleplayers who pretend to play a role. Trial Tr. May 2, 2023, 282:23-25.



Screenshot from Gov't Ex. 800 at 9:02

Shortly after the exchange with Sergeant Cropper, Padilla helped move a large metal banner towards the police line. Gov't Ex. 800 at 9:42-10:04. Dozens of officers scrambled to respond to the banner, because it had the potential to further obstruct their officers to manage the riot. Trial Tr., May 1, 2023, 38:16-22. After the banner crossed over the heads of several officers, an MPD lieutenant deployed more chemical spray to move Padilla and the other rioters away from the police line. Gov't Ex. 800 at 10:04-10:51. Padilla retreated into the crowd to recover. This marked the second time in less than ten minutes that officers used chemical spray against Padilla to stop him from trying to break their line.

At 1:59 p.m., Padilla reemerged in front of another set of MPD officers lining the barricade. Telegraphing his intent to reengage with the police, Padilla asked if they were "ready to beat on me some more?" Gov't Ex. 800 at 11:22-11:28. After Padilla draped his arms over the barricade, an MPD officer tried to push him away, but Padilla did not move. When the officer told Padilla, "You're just going to get sprayed again," Padilla responded, "I don't care." Gov't Ex. 800 at 11:47-12:04. At 2:02 p.m., while standing in front of MPD Detective Sergeant Owais Akhtar and looking

towards the U.S. Capitol, Padilla asked, "Where even is the fucking door to this place?" Gov't Ex. 800 at 12:15-12:20. Padilla then turned towards another officer and said that the officer was "following unconstitutional orders," and that the officer "had a duty to refuse unconstitutional orders." Gov't Ex. 800 at 12:39-12:47. Padilla lobbed these accusations despite the fact that he was violating his own oath to defend the Constitution by attempting to halt the democratic process occurring inside the U.S. Capitol and to dissolve the democratically elected government.[19]  At 2:09 p.m., Padilla again pushed the barricade into officers, including Sergeant Akhtar, but he was now assisted by other rioters. Gov't Ex. 207B. Officers spent approximately a minute fighting back against Padilla and the other rioters. Gov't Ex. 800 at 13:07-14:00.



Gov't Ex. 207B

By 2:35 p.m., Padilla and the other rioters broke through the line of MPD and United States Capitol Police ("USCP") officers along the West Plaza. Gov't Ex. 800 at 14:19.

---

[19] Padilla posted on social media, "While our enlistment periods may come up, our Oath has not expiration date." https://patriots.win/p/GIO4m5Fw/x/c/13zMnYK07b

### *Padilla's Conduct at the Lower West Terrance Tunnel*

> "Because [the rioter's] ability to push and hold as a combined group and their mass against us and us not being able to get out of the tunnel, get to the air, re-establish the line, that was not only hurting the officers, but it was hurting people also in the crowd."

Testimony of MPD Sergeant Paul Riley, May 1, 2023, 163:9-13.

By 2:40 p.m., Padilla had ascended an internal stairwell to the inaugural stage, where he took a video of himself screaming to the crowd below on the West Plaza to "get up here for freedom." Gov't Ex. 800 at 14:32-15:01. After his rallying cry, Padilla pursued the officers into the Tunnel with a crowd of other rioters. Then, referring to his intent to breach the Capitol and obstruct the proceedings, Padilla sent a message to his wife on Facebook, "It's working, babe." She then informs him that lawmakers are in hiding. Trial Tr. May 3, 2023, 543:23-544:4. As this happened, dozens of officers retreated into the Tunnel to regroup. before eventually returning back to the inaugural stage at 2:52 p.m. Padilla then sent another message to his wife stating, "It's not a rally anymore. It's a revolution." Gov't Ex. 301.

Padilla did not return to view until 4:27 p.m. By this time, the officers had pushed the rioters out of the tunnel and towards the archway separating the Tunnel from the inaugural stage. Gov't Ex. 800 at 18:52. As Padilla stood in front of the Tunnel, roughly a dozen rioters began to attack the officers with several different objects including crutches, a hockey stick, and a megaphone. Gov't Ex. 800 at 18:50-19:30, 20:55-21:30. As the assaults waned, Padilla held a flagpole in his right hand and threw it at the officers. Gov't Ex. 229A. Padilla struck USCP Officer Oscar Corado in the head. Gov't Ex. 800 at 19:21-19:24, 20:41-20:45.



Gov't Ex. 229A

Shortly after striking Officer Corado with the flagpole, Padilla held a Gadsden flag and waved it defiantly in front of the officers inside the Tunnel. Gov't Ex. 800 at 21:34.



Screenshot from Gov't Ex. 800 at 21:34

***Padilla's Conduct after January 6, 2021***

In the aftermath of January 6, Padilla bragged about his actions and admitted that his goal had been to interfere with the certification of the election. In one message he said, "Well of course they had never seen anything like that before. We were actually trying to take back our Republic and attacking the Seat of Power." Gov't Ex. 301 at p. 9. In another message he said, "We would have occupied the Capitol if some asshole hadn't stalled our momentum after we pushed the cops into the main hallway." Gov't Ex. 301 at p. 9. Padilla blamed the police for his own decision to engage in violence, claiming, "The line was crossed when they smashed the knuckles and ring finger on my right hand for the crime of resting it on a railing . . . It went from a Stop the Steal rally to an attempt to Restore our Republic . . . ." Gov't Ex. 301 at p. 7. Padilla admitted that beyond merely stopping the certification, he intended to destroy the existing government, "We were attempting to restore the Republic by dissolving the legislature and convening a constitutional convention of the people." Gov't Ex. 301 at p.11. In a separate message on the thedonald.win platform, Padilla said that in addition to dissolving Congress, he wanted to "replace it with Patriots who were there." Gov't Ex. 300 at p. 29.

***Padilla's Trial Testimony***

At trial, the government showed video of Padilla throwing a flagpole at the head of a police officer in the tunnel. Padilla testified that he was not trying to strike this officer. Rather, he said that he was aiming for a random rioter who had bent down to pick up a weapon and was walking towards the Tunnel. Trial Tr. May 2, 2023, 418:8-24. In finding Padilla's version of events to be "simply not credible," Trial Tr. May 3, 2023, 535:12-13, the Court noted that Padilla "watche[d] for minutes as other rioters violently attack[ed] the police line," *id.* at 534:7-8. Padilla also stood nearby "an officer swarmed by a group of rioters who were grabbing onto [the officer]" but Padilla "did nothing." *Id.* at 534:10-13. Despite Padilla's claim that he saw the other rioter bend down to

14

pick up a weapon, the Court noted that the video showed Padilla "turned away from the other rioter at the time that the rioter" bent down. *Id.* at 534:18-22. The videos also showed Padilla "cock[ing] back the flagpole in a throwing position before the rioter even beg[an] to walk" to the Tunnel. *Id.* at 534:23-25 to 535:1-2.

The Court did not credit Padilla's testimony that he had "inten[ded] to only follow legal process," but that he "had the specific intent to obstruct the certification process." *Id.* at 536:6-10. The Court did not credit Padilla's claim that his social media comments "were bravado, rhetoric, or bombast," because his violent acts during the riot confirmed that he intended to act on his words. *Id.* at 547:23-25 to 548:1-3.

In sum, the court found that Padilla made numerous statements during the trial, which were against "the clear video evidence to the contrary." *Id.* at 535:13-14.

## III.    THE CHARGES AND CONVICTIONS

On April 12, 2023, a federal grand jury returned a second superseding indictment charging Padilla with 11 counts. On, May 3, 2023, following a bench trial, this Court convicted Padilla of 10 of the 11 counts as follows:

- Count 1, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);

- Count 3: Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count 4: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b);

- Count 5: Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count 6: Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2;

- Count 7: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count 8: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count 9: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count 10: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

- Count 11: Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).

The Court acquitted Padilla on Count 2, which charged him with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b) in connection with a large metal Trump sign that was pushed through the police line on the West Plaza.

## IV.    STATUTORY PENALTIES

Padilla now faces sentencing on Counts 1 and 3 through 11. The maximum terms of incarceration for each count are as follows:

| Count | Statute | Maximum Term of Imprisonment |
|-------|---------|------------------------------|
| 1 | 18 U.S.C. § 111(a)(1) | 8 years |
| 3 | 18 U.S.C. § 231(a)(3) | 5 years |
| 4 | 18 U.S.C. § 111(a)(1) and (b) | 20 years |
| 5 | 18 U.S.C. § 231(a)(3) | 5 years |
| 6 | 18 U.S.C. §§ 1512(c)(2) and 2 | 20 years |
| 7 | 18 U.S.C. § 1752(a)(1) and (b)(1)(A) | 10 years |
| 8 | 18 U.S.C. § 1752(a)(2) and (b)(1)(A) | 10 years |
| 9 | 18 U.S.C. § 1752(a)(4) and (b)(1)(A) | 10 years |
| 10 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 11 | 40 U.S.C. § 5104(e)(2)(F) | 6 months |

For each of the felony counts—i.e. Counts 1 and 3 through 9, the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

As for the misdemeanor counts, Padilla faces up to six months imprisonment, a fine of up to $5,000, and a mandatory special assessment of $10 per count.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Probation Officer's guidelines calculations resulting in a total offense level of 33 and a criminal history category of I. PSR ¶¶ 69, 72.

### a.    Upward Departure Pursuant to USSG §3A1.4

Section 3A1.4 of the Sentencing Guidelines allows for an offense level adjustment where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5). USSG §3A1.4, cmt. n.1. Where, as here, a defendant's conviction was not for, or was not "intended to promote," an enumerated "federal crime of terrorism," an upward departure is still warranted under Commentary Note 4(A) of Section 3A1.4 if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

A one-level upward departure is appropriate here because the conduct that led to Padilla's ten convictions was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

The government bears the burden to prove that the Note 4(A) departure is applicable by a preponderance of the evidence, based on all relevant conduct. *United States v. Abu Khatallah*, 314

F. Supp. 3d 179, 190 (D.D.C. 2018). In this case, the evidence clearly and overwhelmingly shows that Padilla's conduct was calculated to influence, affect, or retaliate against government conduct.[20]

Upward departures pursuant to Note 4(A) have been applied in the January 6th context against multiple defendants. In *United States v. Rhodes, et al.*, 22-cr-15 (APM), Judge Mehta applied the Note 4(A) upward departure to varying degrees against Elmer Stewart Rhodes (+6), Kelly Meggs (+3), Jessica Watkins (+3), Edward Vallejo (+2), Edward Kenneth Harrelson (+1), Roberto Minuta (+1), Joseph Hackett (+1) David Moerschel (+1) for conspiring to use force against the United States. And in *United States v. Southard-Rumsey*, 21-cr-387 (APM), Judge Mehta granted a one-level upward departure based on the defendant's collective conduct on January 6, which included screaming expletives towards lawmakers on the doorstep of the House of Representatives.[21]

---

[20] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole motive or sole purpose. For example, the D.C. Circuit has held (applying a prior version of Section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose." *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular motivation . . . is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

[21] The defendant in *United States v. Milstreed*, 22-cr-198 (JEB) pleaded guilty via a plea agreement in which he agreed that a two-level upward departure under Note 4(A) is appropriate. Sentencing has not yet occurred, however, so Chief Judge Boasberg has not yet addressed the issue.

Other judges in this district have declined to depart upwards given the specific facts of the cases before them. *See, e.g.*, *United States v. Reffitt*, 21-cr-32 (DLF); *United States v. Judd*, 21-cr-40-3 (TNM); *United States v. Fitzsimons*, 21-cr-158 (RC); *United States v. Wright*, 21-CR-341 (CKK).

First, Padilla carried out coercive and intimidating acts targeting the U.S. government by attacking its agents, namely officers of both the USCP and MPD as they sought to defend the Capitol building and the members of Congress inside. Padilla engaged in repeated, relentless verbal and physical attacks against the officers defending the West Plaza and the Tunnel.

Second, Padilla's intent to influence, affect, or retaliate against the government is clear from his words before, during, and after January 6. Padilla repeatedly advocated for an armed violent revolution of American democracy, resorting to the "Cartridge box,"

Third, Padilla's choice of target—the United States Capitol building— coupled with the level of violence he directed at the police protecting the building further evidences his intent to intimidate, affect, or retaliate against the government.

As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*,8 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target." Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." Id. at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id*. (citing cases).

But Padilla did more than simply attack a physical edifice. Padilla's statements on social media and on the witness stand make clear that he wanted "incite people to storm the Capitol Building and run all the politicians out of it," "dissolve the legislature," and overthrow the United

---

Additionally, Judge Kelly recently applied upward adjustments under §3A1.4 against all five defendants convicted at trial in *United States v. Nordean, et al*., 21-cr-175 (TJK). Each of the defendants in that case had been convicted of a crime that was specifically enumerated under 18 U.S.C. § 2332b(g)(5)(B), and Judge Kelly applied the full adjustment when calculating the defendants' guidelines. Judge Kelly declined to also depart upward pursuant to Note 4(A).

States government. Indeed, in announcing its verdict, this Court summarized the evidence concerning Padilla's intention to "to travel to Washington, D.C., on January 6th to engage in violent protests and occupy the Capitol to disrupt the electoral certification and overthrow the government."

There can be no question that assaulting multiple police officers during his attack on the United States Capitol—while the entire complement of legislators and the Vice President of the United are inside performing their constitutionally mandated duties—with an intent to run those legislators out of the building so that they cannot do their job, qualifies as conduct "calculated to influence or affect the conduct of government by intimidation or coercion." There are thus grounds for an upward departure under Note 4(A).

While §3A1.4(a) mandates a twelve-level enhancement for offenses that involve or promote enumerated federal crimes of terrorism, Note 4(A) provides the sentencing court more latitude. For cases that trigger the alternative grounds described in Note 4(A), the sentencing court may depart upward by any amount (including as little as one day) up to a maximum of twelve levels. Here, the government recommends a one-level upward departure, which would raise Padilla's total offense level to 34 and his Guidelines range of imprisonment to 151 to 188 months.

A one-level upward departure accounts for the applicability of Note 4(A) and the relentless violence perpetrated by Padilla to achieve his political goals.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy, albeit within guidelines range, term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Padilla's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Padilla repeatedly exclaimed his desire to dissolve Congress, install rioters as the new legislative branch, and overturn the results of the 2020 presidential election—both on social media before and after January 6, 2021, and during his assaultive conduct on the Capitol grounds. Padilla assaulted multiple police officers, striking one in the head with a dangerous weapon, and rallied the mob in an attempt to enter the Capitol Building and execute his political goals.

The nature and circumstances of Padilla's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 171 months.

### B.  The History and Characteristics of the Defendant

Two of the defendant's prior vocational activities and his educational background weigh in favor of a guidelines sentence in this case.

First, for approximately eight months in 2019, Padilla was employed as a correctional officer with the Silverdale Detention Center in Chattanooga, Tennessee. PSR ¶ 113. Although this employment was brief, as a correctional officer Padilla knew the importance of following commands of law enforcement as well as the danger law enforcements faces when outnumbered by an unruly mob.

Second, Padilla served ten years in the U.S. Army National Guard, from July 2002 until he was honorably discharged in October 2012 at the rank of Sergeant E-5. PSR ¶ 117.

While a defendant's prior military service is commendable, in a case such as this, Padilla's military service weighs in favor of a lengthier sentence. On January 6th, Padilla actively fought against the very United States he previously swore to protect, and fought to undermine the Constitution that he previously swore to defend.

Padilla is educated and highly intelligent having completed some college, and speaking English, French, Spanish, and German. PSR ¶¶ 104-108. Based on his social media posts, Padilla is a student of history and is highly knowledgeable about American government and politics despite having no formal educational degrees beyond a GED.[22] Despite his disability, Padilla was responsible for raising his children and managing the household while his wife worked outside of the home. PSR ¶ 112. In short, the defendant is someone who should have known better than to have committed the offenses of conviction. There is nothing about the defendant's history or characteristics that merit a sentence below the applicable guidelines range.[23]

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Padilla's criminal conduct on January 6 was the epitome of disrespect for the law.

---

[22] For example, Padilla posted on topics such as the oppression of Jacobin thought (https://patriots.win/p/HrAvRXd5/x/c/17txRIw9Bo?d=50), factors leading to the fall of Rome (https://patriots.win/p/GINz8IiK/x/c/13zMZQuFxj?d=50), and the Albigensian Crusade in 13th Century France (https://patriots.win/p/11Ql6QxJsF/x/c/4DpMLBMqmO8?d=50).

[23] Padilla also has a history of making in appropriate sexual and demeaning references toward female legislators. *See*, *e.g.,* https://patriots.win/p/11Q8lWZbZS/x/c/ (regarding Congresswoman Alexandria Ocasio-Cortez) and https://patriots.win/p/11R4py3Fwf/x/c/4Dru0xLSJK5 (regarding then-Congresswoman Tulsi Gabbard and Congresswoman Ocasio-Cortez).

**D.**       **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[24] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Padilla's social media posts after January 6th demonstrate his desire and willingness to engage in future political violence if not deterred. Specifically, after January 6, 2021, Padilla posted, "What happened Wednesday is what needs to be done again and again," "I'm done being passive," and in a post advocating against voting and in favor of revolution, "that will not be an easy, or peaceable process. Too many of you lack the testicular fortitude to do what needs to be done." Gov't Ex. 300.

Further, Padilla lacks any remorse for what he did on January 6th. When confronted with clear evidence that showed him launching a flagpole at the head of a police officer, Padilla fabricated a story that he instead targeted a random rioter to protect the officer. Padilla's willingness to lie under oath shows that he does not think what he did during the riot was wrong. Rather, he thinks what he did was patriotic, which means he will commit a similar offense if not deterred otherwise.

---

[24] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[25]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[25] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[26]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court should consider *United States v. Thomas Webster*, 21-cr-208, in which Judge Mehta sentenced the defendant to 120 months' incarceration after a jury trial. Like Padilla, Webster was convicted of violating 18 U.S.C. §111(b), among other crimes, for using a flagpole in his assault on the officer. Webster and Padilla both testified under oath in their defenses, and both were found to be untruthful. Webster's public service as a former police officer and Marine as both mitigating and aggravating factors. This Court should view Padilla's service as a correctional officer and Army Sergeant similarly. Unlike Padilla, Webster's guidelines range was elevated by enhancements for destroying evidence and using body armor. Webster's assaultive conduct was also limited to a single interaction with a single victim, whereas Padilla engaged in repeated assaultive and obstructive conduct for several hours. And unlike Webster, Padilla was convicted of obstruction of an official proceeding, which conviction drives the guidelines analysis in the PSR.

---

[26] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This Court should also consider *United States v. Peter Schwartz*, 21-cr-178, in which Judge Mehta sentenced the defendant after a jury trial to 170 months of imprisonment. Armed with a wooden tire knocker, Schwartz threw a chair at a line of police officers on the Lower West Terrace, creating an opening in the line that enabled hundreds of rioters to flood the area as overwhelmed officers were forced to retreat. He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they tried to escape the mob. Schwartz later made his way to the Tunnel, where he sprayed the group of officers with pepper spray. Both Schwartz and Padilla engaged in assaultive conduct over an extended period of time, from the West Plaza to the Lower West Terrace Tunnel, and used makeshift weapons against the police. After the riot, Schwartz—like Padilla— showed no remorse and instead demonstrated nothing but pride for his conduct. Although Schwartz had a prolific criminal history, resulting in a criminal history category of VI, his total offense level was only two points higher than Padilla's offense level would be after application of a one-level upward departure under §3A1.4(a).

As of the date of this sentencing memorandum, Padilla is the most violent January 6th defendant to be sentenced by this Court.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Padilla was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[27]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Padilla to pay $2,000 in restitution for his convictions on Counts 1 and 3 through 9. This amount fairly reflects Padilla's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant

---

[27] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 171 months of incarceration followed by three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $820.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481 052

*/s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8604
douglas.brasher@usdoj.gov

*/s/ Andrew Haag*
ANDREW S. HAAG
Assistant United States Attorney
MA Bar No. 705425
601 D Street, N.W.
Washington, DC 20530
(202) 252-7755
Andrew.Haag@usdoj.gov